# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v STEWART

Docket No. 162497. Argued on application for leave to appeal January 11, 2023. Decided July 31, 2023.

Joshua L-J Stewart was convicted following a jury trial in the Wayne Circuit Court of three counts of armed robbery, MCL 750.529; assault with intent to commit murder, MCL 750.84; receiving and concealing stolen property valued between $1,000 and $20,000, MCL 750.535(3)(a); and possession of a firearm during the commission of a felony, MCL 750.227b. Defendant allegedly aided and abetted two other individuals in two armed robberies by serving as the getaway driver. Two of the victims were shot by the perpetrators during the robberies, and one of the victims died as a result of his injuries. Defendant was arrested and questioned after he drove one of the perpetrators to the hospital in the vehicle used in the robberies. During his interview with police officers, defendant eventually admitted to driving the getaway vehicle. Before trial, defendant moved to suppress statements he made during his police interview, arguing that the statements were involuntary because of coercive interview techniques and promises of leniency by the interrogating officers. The trial court, Michael Callahan, J., denied the motion. Defendant appealed, and in an unpublished, per curiam opinion, the Court of Appeals, GLEICHER, P.J., and K. F. KELLY, J. (SHAPIRO, J., concurring), also rejected defendant's argument that the statements were involuntary and affirmed his convictions. Defendant sought leave to appeal, and the Supreme Court ordered and heard oral argument on whether to grant defendant's application for leave to appeal or take other action. 508 Mich 941 (2021).

In an opinion by Chief Justice CLEMENT, joined by Justices BERNSTEIN, CAVANAGH, WELCH, and BOLDEN, the Supreme Court *held*:

The totality of the circumstances of defendant's interrogation, including his age, the timing of the interview, the officers' references to leniency, the officers' use of falsehoods, and the officers' overall tone and use of language, created an environment in which defendant's free will was overborne and the statements he gave were involuntary. The use of these statements at trial violated defendant's constitutional rights, and he was entitled to a new trial.

1. The use of an involuntary statement elicited by coercive state action in a criminal trial violates an individual's constitutional right to due process and against self-incrimination. To determine whether a statement was involuntary because of state coercion, a reviewing court must

consider whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made. While all relevant circumstances must be considered, in *People v Cipriano*, 431 Mich 315 (1988), the Supreme Court specifically directed consideration of the following factors: the age of the accused; their lack of education or their level of intelligence; the extent of their previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before they gave the statement in question; the lack of any advice to the accused of their constitutional rights; whether there was an unnecessary delay in bringing them before a magistrate before they gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when they gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the accused was threatened with abuse. Additionally, promises of leniency can render a confession involuntary, such as express or implied assurances that cooperation will aid the interviewee's defense or result in a lesser sentence.

2. In the present case, defendant was 18 years old at the time of the interview and, thus, an adult under the law. However, 18-year-olds are still maturing, physiologically and neurologically, and therefore their decision-making abilities are not fully developed. Although a defendant's age alone does not render their statements involuntary, age is a relevant circumstance to be considered as one factor in the voluntariness analysis. In this case, defendant's age made him more susceptible to suggestions from law enforcement and less likely to engage in reasoned decision-making. Next, the length of the interview, at approximately three hours, was not excessively long; however, it took place in the early morning, and there was no indication that defendant slept or had the opportunity to sleep in the interval between when he arrived at the hospital the night before and the beginning of the interview. Sleep deprivation, along with the deprivation of other basic necessities such as food and water, has long been considered a factor weighing against the voluntariness of a statement. Regarding defendant's health, there was an indication in the record that defendant had recently undergone treatment for cancer and may have been suffering from ill effects of the treatment that could have affected his ability to endure interrogation. Other *Cipriano* factors weighed in favor of voluntariness or were largely neutral: defendant was advised of his rights at the beginning of the interview, and defendant did not allege that he was injured, intoxicated, or drugged when he was interviewed. Further, the record was silent as to whether defendant had any cognitive challenges. And finally, defendant had a previous juvenile adjudication, meaning that he had some limited previous experience with the police. Outside of the *Cipriano* factors, the Court also had to address any other factual circumstances, psychological effects, and coercive tactics employed by the officers that may have contributed to an overbearing of defendant's free will. In this case, one such tactic employed by law enforcement was the officers' repeated and specific references to leniency. While the officers did not make explicit promises of leniency, they heavily implied that defendant would receive a sentence of 20 years to life if he did not cooperate but that he could receive a sentence as low as two years if he did. The record reflected that defendant took these statements as an assurance of a lesser sentence if he cooperated. The officers also lied to defendant regarding the extent of the evidence against him, falsely claiming that an eyewitness and home surveillance video placed him at the scene of the incidents. Exaggerating the strength of the case against defendant weighed against a finding that defendant's inculpatory statements were made of a free and voluntary mind. Finally, the overall tone of the interview was combative, and the officers made frequent use of profanity and racial slurs, which isolated and belittled defendant and likely rendered him more susceptible to the other

coercive tactics that were employed. While any one of the circumstances articulated may not have been sufficient to render defendant's statements involuntary, when considered collectively, the cumulative effect of the circumstances on defendant's free will was such that defendant's statements were not freely and voluntarily made. Because the use of these involuntary statements violated defendant's right to due process, his convictions could stand only if the prosecutor could prove that the error was harmless beyond a reasonable doubt. The prosecutor could not do so: although defendant arrived at the hospital in the vehicle used in the robberies, the only additional evidence that tied him to those robberies was defendant's own incriminating, involuntary statements. Defendant's arrival at the hospital in the vehicle used in the robberies may have been probative of guilt, but it was not sufficient to conclude beyond a reasonable doubt that a rational jury would have found defendant guilty absent the error in admitting his involuntary statement.

Court of Appeals judgment reversed, and case remanded for a new trial.

Justice VIVIANO, joined by Justice ZAHRA, dissenting, agreed with many of the majority opinion's separate analyses of the *Cipriano* factors, finding them individually inadequate to make the confession involuntary, but he did not agree that the factors combined to render the confession involuntary. Because there was no physical abuse, threats, or promises of leniency during the interrogation, and none of the more subjective factors supported a finding of involuntariness, Justice VIVIANO would have held that the confession was voluntary. He noted that although the United States Supreme Court has stated that coercion can be mental as well as physical, none of its decisions has concluded that police tactics that did not involve physical or mental exhaustion were sufficient to show involuntariness. Moreover, courts have recognized that police may play on a suspect's ignorance, fear, or anxieties so long as doing so does not render a rational decision impossible. Therefore, even if a defendant's characteristics can be considered, the focus of the voluntariness analysis should be on police conduct and whether any threats, intimidation, or physical force were employed. In this case, the officers administered *Miranda* warnings,[1] and it has often been assumed that giving *Miranda* warnings will generally render any subsequent confession voluntary. Although defendant quibbled with the administration of the warnings, he did not identify any flaws with the information conveyed by the warnings or with his understanding of them. The majority opinion's conclusion that 18-year-olds are too immature to resist pressures to confess or make significant life decisions relied on flawed scientific studies and raised significant equality and autonomy concerns. Justice VIVIANO further noted that defendant provided no evidence to support the majority opinion's determination that defendant's cancer treatments affected the voluntariness of his confession. He also disagreed with the inference of the majority opinion that the timing of the interview suggested that defendant was sleep deprived; moreover, to the extent defendant was tired during the interview, this was not a result of police conduct. Additionally, nothing in the present case amounted to an impermissible promise of leniency. Although the officers implied that defendant had some control over the outcome of his case, they expressly denied stating any number of years for a sentence and made clear that they had no power to make such a promise. Finding a promise in light of the officers' denials would make meaningless the rule that general assurances of leniency are permissible. Similarly, contrary to the majority opinion's conclusion that the officers' misrepresentation of the strength and nature of the evidence against defendant weighed in favor of exclusion, the United States Supreme Court

---

[1] *Miranda v Arizona*, 384 US 436 (1966).

has expressly rejected a ban on police tactics employing such trickery. In general, trickery short of outright fraud, such as false promises of leniency, is permissible. Additionally, although the majority opinion accuses the officers of using intemperate language, it offers no persuasive support that such a tactic was coercive. There was no evidence that the officers' language involved impermissible threats, and any combative tone was irrelevant without more. Further, the majority opinion recognized that some of the most critical factors favored a finding of voluntariness: defendant was not physically abused or threatened; he was not injured, intoxicated, or drugged; and he had prior experience with law enforcement. The majority opinion never explains why these key factors were overcome by the more subjective and psychological factors that other courts have not found sufficient, by themselves, to make a confession involuntary. Ultimately, the majority substituted its views on best practices for police interrogations for what the Constitution demands. Justice VIVIANO feared that standard police interview techniques—ones used for decades to solve some of the most heinous crimes—were imperiled by the majority's decision.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 31, 2023

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v                                     No. 162497

JOSHUA LAMAR-JAMES STEWART,

       Defendant-Appellant.

BEFORE THE ENTIRE BENCH

CLEMENT, C.J.

At issue in this case is whether defendant's statements to law enforcement, made during an early-hours interrogation, were voluntary. Considering the totality of the circumstances, we conclude that defendant's statements were involuntary and that the trial court erred by failing to suppress them.

## I. FACTS AND PROCEDURAL HISTORY

On May 6, 2016, then-18-year-old defendant allegedly aided and abetted two other men in a pair of armed robberies by serving as a getaway driver. Two victims were targeted during the first robbery, and one of the victims (Aaron Foster) was shot. During the second robbery, a shootout ensued between the perpetrators and the victims, and a perpetrator (Deontea White) and a victim (Daniel Claxton) were both shot. The perpetrators' vehicle, a Dodge Intrepid, was struck by bullets multiple times during the shootout.

Foster, Claxton, and White were all taken to Detroit Receiving Hospital for treatment. Foster arrived first, accompanied by Detroit Police Officer John Siejutt, and was announced dead on arrival. Claxton arrived second, driven by his brother, who had also been present for the second robbery. Finally, White arrived last, driven by defendant.

After defendant and White arrived, hospital security alerted Officer Siejutt that a bullet-riddled vehicle transporting a gunshot victim had arrived at the hospital. Officer Siejutt approached and questioned defendant in the parking lot. Defendant disavowed involvement in any shooting, claiming instead that he had been walking down the street when he saw White lying wounded in the backseat of the Intrepid. According to defendant, he decided to get into the driver's seat and transport White to the hospital.

While Officer Siejutt questioned defendant, another officer brought Claxton's brother to the parking lot. There, Claxton's brother stated that he recognized the Intrepid as the shooters' vehicle and defendant's white T-shirt as the white T-shirt worn by the shooters' driver. Shortly thereafter, the officers determined that the Intrepid had been reported as stolen, and the officers arrested defendant. A subsequent search of the vehicle

2

resulted in the discovery of Foster's stolen belongings, linking the Intrepid to the first robbery.

The officers interrogated defendant after the arrest, during the early hours of the morning. Defendant eventually admitted to driving the Intrepid during both robberies but denied knowing that the other two men had been armed and intended to commit robberies that day.

Defendant was charged with first-degree felony murder, MCL 750.316(1)(b); three counts of armed robbery, MCL 750.529; assault with intent to commit murder (AWIM), MCL 750.83; assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84; assault with intent to rob while armed, MCL 750.89; receiving or concealing stolen property valued between $1,000 and $20,000, MCL 750.535(3)(a); and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Before trial, defendant moved to suppress the admission of his statements from the May 7, 2016 law enforcement interrogation, arguing, in part, that his statements were involuntarily made because of coercive interrogation techniques and promises of leniency. The trial court disagreed and denied defendant's motion.

A jury trial commenced, and ultimately, the jury acquitted defendant of murder and AWIM but found defendant guilty of all remaining charges.

On appeal, defendant pursued his claim that his interrogation statements were involuntarily made and should not have been admitted at trial. But, in an unpublished, per curiam opinion, the Court of Appeals rejected that claim and defendant's remaining arguments and affirmed defendant's convictions. *People v Stewart*, unpublished per curiam opinion of the Court of Appeals, issued November 24, 2020 (Docket No. 343755).

3

Defendant sought leave to appeal, and this Court directed oral argument on the application regarding "whether the statement [defendant] made to the police was not voluntary because the interrogating officers employed overly coercive tactics, including promises of leniency. *People v Conte*, 421 Mich 704[; 365 NW2d 648] (1984)[;] see also *People v Shipley*, 256 Mich App 367, 373[; 662 NW2d 856] (2003)."[1] *People v Stewart*, 508 Mich 941, 941 (2021).

## II. LEGAL BACKGROUND AND ANALYSIS

This Court reviews de novo a trial court's decision on a motion to suppress but reviews all underlying factual findings for clear error. See *People v Elliott*, 494 Mich 292, 300-301; 833 NW2d 284 (2013). A finding is clearly erroneous if, after a review of the entire record, the reviewing court is left with a definite and firm conviction that the trial court made a mistake. *People v Givans*, 227 Mich App 113, 119; 575 NW2d 84 (1997).

### A. INVOLUNTARINESS

Both the United States and Michigan Constitutions protect citizens against self-incrimination and afford due process of law. US Const, Ams V and XIV; Const 1963, art 1, § 17. The use of an involuntary statement elicited by coercive state action in a criminal trial violates these constitutional protections. *Colorado v Connelly*, 479 US 157, 165; 107 S Ct 515; 93 L Ed 2d 473 (1986); *People v Cipriano*, 431 Mich 315, 331; 429 NW2d 781 (1988). In other words, "[i]f an individual's will was overborne or if his confession was not the product of a rational intellect and a free will, his confession is

---

[1] This Court also directed oral argument regarding defendant's sentencing arguments. However, our resolution of defendant's voluntariness issue renders these other issues moot. See *People v Richmond*, 486 Mich 29, 34; 782 NW2d 187 (2010).

inadmissible because [it was] coerced." *Townsend v Sain*, 372 US 293, 307; 83 S Ct 745; 9 L Ed 2d 770 (1963) (quotation marks and citations omitted), overruled in part on other grounds *Keeney v Tamayo-Reyes*, 504 US 1; 112 S Ct 1715; 118 L Ed 2d 318 (1992). Coercive tactics that can overbear an individual's will include both physical intimidation and psychological pressure. *Townsend*, 372 US at 307; see also *Jackson v Denno*, 378 US 368, 389; 84 S Ct 1774; 12 L Ed 2d 908 (1964) (observing that a continuum of means of overcoming a defendant's free will exist, "from acts of clear physical brutality to more refined and subtle methods"). When the voluntariness of a confession is challenged, "the burden is on the people to demonstrate voluntariness by a preponderance of the evidence." *Conte*, 421 Mich at 754-755 (opinion by BOYLE, J.) (citation omitted).

To determine whether a statement was involuntary because of state coercion, a reviewing court must consider "whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Cipriano*, 431 Mich at 334. While all relevant circumstances must be considered, this Court has specifically directed consideration of the following factors:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id.*]

Further, promises of leniency can render a confession involuntary. *Conte*, 421 Mich at 724-725 (opinion by WILLIAMS, C.J.). While general observations regarding leniency—

5

e.g., that it would be better if the interrogee told the truth, that the interrogee's cooperation will be brought to the attention of officials responsible for charging or sentencing decisions, or that cooperation has been looked upon favorably by those officials in the past—will not render a statement involuntary, express or implied assurances that cooperation will aid the interrogee's defense or result in a lesser sentence may do so. See *id*. at 740; see also *Givans*, 227 Mich App at 119-120. However, promises of leniency remain only one factor to be considered within the totality-of-the-circumstances analysis. *Conte*, 421 Mich at 754 (opinion by BOYLE, J.);[2] *Givans*, 227 Mich App at 117.

B. DETAILS OF THE MAY 7, 2016 INTERROGATION

To determine whether defendant's May 7, 2016 statements to law enforcement were voluntary, a closer examination of the interrogation is necessary.

As detailed above, after defendant arrived at the hospital, he was briefly questioned by Officer Siejutt in the hospital parking lot. When officers discovered that the Intrepid that defendant had been driving was stolen, officers arrested defendant.

Defendant's postarrest interrogation began at 3:36 a.m. and lasted until 6:41 a.m. At the beginning of the interrogation, Detroit Police Officer James MacDonald proposed

---

[2] In *Conte*, a majority of this Court rejected a proposition to consider promises of leniency under a separate, more stringent analysis. Although the lead opinion, authored by then Chief Justice WILLIAMS and joined by Justices LEVIN and KAVANAGH, advocated for the more stringent analysis, see *Conte*, 421 Mich at 729 (opinion by WILLIAMS, C.J.), Justices BOYLE, RYAN, BRICKLEY, and CAVANAGH held that promises of leniency should be considered within the totality-of-the-circumstances analysis, see *id*. at 754-755 (opinion by BOYLE, J.); *id*. at 761 (BRICKLEY, J., concurring in part with BOYLE, J.); *id*. at 761-762 (CAVANAGH, J., concurring in part with BOYLE, J.). See also *Givans*, 227 Mich App at 119-120 (counting the votes in *Conte* and concluding the same).

6

that they "go through some paperwork real quick" and proceeded to ask defendant general questions about defendant's background, including the spelling of defendant's name, his date of birth, and his level of education. Officer MacDonald then presented defendant with an advice-of-rights form and asked defendant to read, sign, and date it; defendant complied. Defendant asked the officers what his charges were, and Officer MacDonald replied that they were there "to talk to [defendant] about the—the stolen car." Officer MacDonald then returned to questioning defendant regarding his background and other general information.

Eventually, the officers guided the interrogation back to the day's events. Officer MacDonald asked defendant: "So tell us about—tell us about today. What—what happened?" Defendant repeated the series of events he had earlier described to Officer Siejutt:

> *Mr. Stewart*: . . . I seen [White[3]] in the car shot up. And hopped in the car, drove to the hospital. The door was open. Ran up to the car, that was in the backseat. He was shot up in the neck. Couldn't really see the other places but I know when I got to the hospital he had three bullet wounds or whatever. Got in and drove him down there. That was it. That's all I—you know.

The officers questioned how defendant had happened upon White lying wounded in the Intrepid. Defendant explained that a cousin had given him a ride partway to a store, dropping defendant off at an intersection before heading to the other side of town. While en route to the store on foot, defendant encountered White and the bullet-riddled vehicle. The officers expressed some skepticism of this explanation and defendant's narrative overall. For example, Officer MacDonald asked, "So, you get dropped at Emery and

---

[3] During the interrogation, defendant referred to White as "Prophet," the name by which he knew White.

7

Greeley and you want me and my partner [to] sit here and believe that you just happened to come across your boy in a car, shot up[?]"

Shortly thereafter, Officer MacDonald informed defendant that he was investigating not only the stolen car, but also the shooting that resulted in White's injuries. He then posited that defendant was involved in the two robberies that had occurred that day:

> *Officer MacDonald*: . . . Ya'll [sic] pull up, do a robbery—just listen. Ya'll do a robbery and [White] end up getting shot cause my man got a pistol. So then [White] drop the gun. A black gun with an extended clip. And you race him to the hospital. Right? So, now ya'll at the hospital. [White] shot. You locked up for being in the car. So, in the car that you driving is evidence or items taken from another robbery that happened off of Packard and [Savage]. . . . So you ain't involved in not one of those?

When defendant denied his involvement, Officer MacDonald countered that defendant could not verify his whereabouts and accused him of having conflicting stories.[4] At this point in time, the interrogation took on a more confrontational tone:

> [*Detroit Police Detective Kelly Lucie*]: After the Family Dollar where were you going to go?
>
> *Mr. Stewart*: Smoke.
>
> *Detective Lucie*: With who?
>
> *Mr. Stewart*: What you mean with who? Myself. I'm smoke by myself.
>
> *Detective Lucie*: You trying to get smart with me?

---

[4] When asked what store he was going to, defendant at one point responded, "I wasn't even going to the store. I was just roaming the hood." But when reminded that he had said earlier that he was going to the store, defendant clarified that he was going to the Family Dollar to purchase blunts. This discrepancy appears to be the basis of Officer MacDonald's accusation of conflicting stories.

*Mr. Stewart*: No.

*Detective Lucie*: Cause you don't want to battle.

\*   \*   \*

*Detective Lucie*: If I ask you who the fuck you was smoking with you tell me.

*Mr. Stewart*: And I'm saying myself. I said I was going to smoke by myself.

*Detective Lucie*: But you didn't.

*Mr. Stewart*: Cause I never got to it. I never got to the Family Dollar.

*Detective Lucie*: I know. Cause you were doing something else.

As the interrogation continued, both officers continued to express strong disbelief regarding defendant's narrative of events:

*Officer MacDonald*: But I'm not going to believe that—that—that bullshit. Cause don't nobody in the hood just be walking down the street and be like oh let me fucking go be nosy. Let me be a mother fucking hero.

\*   \*   \*

*Officer MacDonald*: All right, Josh listen. At what point are you going to sit here and say and be honest about what the fuck happened? Because I'm not buying that shit.

\*   \*   \*

*Officer MacDonald*: Who did you rehearse this story [w]ith? Who did you ask what you should tell the police? You asked somebody. You asked somebody. I gotta talk to the police when I get there so what should I say.

\*   \*   \*

*Officer MacDonald*: You know what else is dumb sitting here telling me this bullshit ass story you telling me. N\*\*\*\*\*, you had a better off chance stumbling across a mother fucking gold before you stumbled across a mother fucking car that's shot the fuck up. That shit just don't happen.

9

* * *

*Detective Lucie*: Be in charge of your life right now and quit playing [w]ith me.  Quit playing [w]ith me.  Just tell me the truth.  Just tell me the truth.

* * *

*Officer MacDonald*: So it's like you trying to sit there and convince your mother and your father that you didn't do some shit when we know you did.  We didn't say you killed nobody.

* * *

*Officer MacDonald*: . . . You sitting here—instead of sit here manning up and be like hey this is what happened.  That wasn't supposed to happen.  I didn't know that was going to happen.  Instead you sitting here saying I stumbled across the mother fucking car [w]ith somebody shot in it and lo[] and behold it's a dude I fucking know so I took his ass to the hospital instead of calling the police cause I don't know what the fuck going on. . . .  And I'm supposed to—me and my partner supposed to take this thing.  Oh, oh shit, okay.  All right Josh.  All right, Josh.  Yep, yep, yep.  Hell no.  I been doing this shit 15 years.  She been doing this shit 16.  That shit don't work that way.

* * *

*Officer MacDonald*: . . . You can sit here and lie about all this other shit but that mother fucking phone going to be like, hey Officer MacDonald.  Come holler at me.

* * *

. . . So, you sit there across that fucking table and you keep telling me and my partner I don't know what the fuck you talking about.  You keep playing that game.  Cause that phone's a [witness] against your ass.  That's what your phone is.  It's a [witness] against you. . . .  Now you can sit here and throw that shit away and let your phone be your fucking worst enemy or you fucking let your phone fucking be your fucking friend and fucking help you out.  It's your fucking decision.  But we came to you as a fucking man.  You 18.  You considered a fucking man.  Legally.  But you don't fucking act like one.  Gotta fucking start manning up to shit.

Defendant, in return, insisted that his narrative of events was true, that it was not concocted with others as an alibi, and that he had explained it consistently to law enforcement.  He

10

also repeatedly stated, "I'm trying to just get out of here," and at one point, he asked, "What else do ya'll need though?"

Alongside their increasing expressions of disbelief, the officers introduced the likelihood that White would blame defendant for the robberies and resultant deaths, their belief that defendant was not responsible for the persons harmed, and their encouragement for defendant to disclose his further involvement in the robberies. In so doing, the officers referred to the possibility of defendant serving "20 to life":

> *Detective Lucie*: Just tell us what happened. Get this shit off your chest, man. Because at the end of the day he's smarter than you. He made bad decisions. He got caught up. But he smarter than you. He going to run circles around your ass when it comes to the judicial system. He gone to have you looking stupid as fuck and you going to do 20 to life—

> *Mr. Stewart*: Why I'm going to do 20 to life?

> *Detective Lucie*: Cause you're involved.

> \* \* \*

> *Officer MacDonald*: So, you want to sit here and put your fate in what you think mother fuckers can't prove? You going to lose.

> *Mr. Stewart*: Man,

> *Officer MacDonald*: Listen—

> *Mr. Stewart*: Dude, 20 years though—

> *Officer MacDonald*: Man, I didn't say you was going to do 20 years. I didn't say he was going to do 20 years. You control that. You control— listen, Man—at the end of the day, Bro, you control your own—you control your own destiny.

11

Officer MacDonald later elaborated on this theme of taking responsibility with the story of another, similarly situated defendant who cooperated with law enforcement and received a lesser sentence:

> *Officer MacDonald*: [Y]ou know I just got done doing a homicide trial, Man? This mother fucker shot two people with his sister in the car. . . . And she was scared to leave. You know what this mother fucker did? Point the gun at her and told her drive the fuck off because he didn't give a fuck about her. And when she got locked up I talked to her. She did the same shit you did. "Man, I don't got nothing to say. I'm protect[ing] my brother." Two weeks later you know what she did? "Hey, MacDonald, Man, I want to talk to you." Fuck that. I ain't let this mother fucker decide my fate. This mother fucker got found guilty of murder. You know what she got, Bro? Mother fucking two years. Because she decided her own mother fucking fate. If she'd went into that courtroom with the same attitude you got you know what happen to her? She get found guilty of murder. And then she'd been gone forever. But instead she took her own fate in her own hands and she got two years. . . .

> \* \* \*

> She doing two years. Soon as you do two years her record is clean.

Eventually, after nearly two hours of expressly disclaiming any involvement in the robberies, defendant admitted he was responsible for "[d]riving there," lamenting, "Ya'll talking bout two, three years." He again referred to the suggested length of imprisonment later during the interrogation as the motivation behind his admissions:

> *Mr. Stewart*: . . . For my mama though. Cause ya'll talking about 20 or 2. Who wouldn't take 2. Do you feel me?

> *Detective Lucie*: Well, we're not saying—

> *Mr. Stewart*: Hell.

> *Detective Lucie*: We're not the judge and we're not the jury. We don't—we don't hand down sentencing. All we do is investigate the crime. But over the years we've seen that we've been explaining how someone does the right thing they come out winning. It's the people that's—

> *Mr. Stewart*: So I should come out a winner.
>
> *Detective Lucie*: You can be.

Officer MacDonald elaborated, "You sit here and asked her am I going to turn out good on this and I sit here and told you yeah if you 100%—if you truthful all the way through this yeah it's gonna turn out good for you."

The officers then sought additional information from defendant about the chronology of the robberies. Officer MacDonald encouraged, "You heading [in] the right direction." As the officers continued to attempt to solicit additional information, defendant responded in frustration, "I was driving the car. That was it. What else? Cause I know you want something else."

Ultimately, much of the additional information defendant then provided was first mentioned by the officers. For example, defendant stated that White dropped his firearm after Officer MacDonald stated that White did so, but he could not provide any details as to how that happened. And after initially saying that it was just defendant and White in the vehicle, defendant amended his narrative to say that there was a third person present—but only after Officer MacDonald falsely informed him that one of the nearby houses had a surveillance camera that had captured the event and showed three participants.

By the close of the interrogation, the officers had elicited statements from defendant that he was responsible for driving the vehicle and that he saw one of the perpetrators return to the vehicle with a rifle after the first robbery.

## C. DEFENDANT'S STATEMENTS WERE INVOLUNTARY

At issue here is whether the statements given by defendant during the May 7, 2016 interrogation were voluntary. Although all relevant circumstances must be considered, we

13

begin first with the factors specifically identified by this Court in *Cipriano*, 431 Mich at 334.

Regarding defendant's age, defendant was 18 years old at the time of the interrogation. While this renders defendant an adult under the law, we have elsewhere recognized that 18-year-olds are still undergoing physiological and neurological maturation, meaning that their decision-making abilities are not fully developed. See generally *People v Parks*, 510 Mich 225; 987 NW2d 161 (2022). Because their development is not yet complete, 18-year-olds "are hampered in their ability to make decisions, exercise self-control, appreciate risks or consequences, feel fear, and plan ahead"; are "more susceptible to negative outside influences, including peer pressure"; and are "less fixed in their characteristics and more susceptible to change as they age." *Id*. at 250-251. In the context of a police interrogation, as here, these characteristics may lead an interrogee to prioritize immediate benefits over long-term consequences—resulting in behaviors such as falsely confessing in exchange for release—or to comply with the authority or perceived desires of a police officer regardless of the consequences. See *JDB v North Carolina*, 564 US 261, 275-276; 131 S Ct 2394; 180 L Ed 2d 310 (2011) (discussing the potential effects of youth on interrogees under 18 years old); *Gallegos v Colorado*, 370 US 49, 52-54; 82 S Ct 1209; 8 L Ed 2d 325 (1962) (same).[5]

---

[5] More specifically, studies have established that adolescents who were under the age of 18 at the time of an alleged offense and were later exonerated had falsely confessed at a much higher rate than adult exonerees. See Gross & Shaffer, *Exonerations in the United States, 1989–2012: Report by the National Registry of Exonerations* (June 22, 2012), p 60 (citing a 2003 report that examined 873 exonerations and found that 42% of adolescent exonerees had falsely confessed, as compared to 15% of all exonerees and 8% of adult exonerees without known known mental disabilities), available at <https://perma.cc/SM4D-D7MY>; Tepfer, Nirider & Tricarico, *Arrested Development:*

14

To be clear, a defendant's age alone does not render their statements involuntary, and defendant here was likely less influenced by these characteristics than, for example, a 14-year-old. But defendant's age and its attendant characteristics are relevant to our analysis. When defendant was interrogated, he was still attending secondary school and living with family. He made repeated requests to call his mother during the interrogation and repeatedly lamented that he let her down. Further, the officers made frequent and repeated references to defendant's young age. They told him to "man[] up," chastised him for not "fucking act[ing] like [a man]," and commented on shifts in the depth of defendant's voice. Defendant's age mattered, both in how he perceived and responded to the officers' statements, and in how the officers treated him. And as discussed, defendant's age made him more susceptible to suggestions from law enforcement and less likely to engage in reasoned decision-making.

The dissent inaccurately characterizes our consideration of defendant's youth as a bright-line rule that "18-year-olds are too immature to resist pressures to confess or make other significant life decisions." Today's decision does not create a bright-line rule that any statement by an 18-year-old to law enforcement is involuntarily given. Instead, we contemplate age as a relevant circumstance to be considered as one factor in the

*Convictions of Innocent Youth*, 62 Rutgers L Rev 887, 904 (2010) (finding that 31.1% of adolescent-offender exonerees in the study had falsely confessed, compared to 17.8% of adult-offender exonerees); Drizin & Leo, *The Problem of False Confessions in the Post-DNA World*, 82 NC L Rev 891, 945 (2004) (concluding that a "suspect's age is strongly correlated with the likelihood of eliciting a false confession"). While these studies, as well as the *JDB* and *Gallegos* decisions, concern juvenile interviewees, given our recognition in *Parks* of the continuing effects of youth on 18-year-olds, we believe that these considerations may remain relevant after the age of majority.

15

voluntariness analysis, which is consistent with decades of established caselaw.  See, e.g., *Haley v Ohio*, 332 US 596, 600-601; 68 S Ct 302; 92 L Ed 224 (1948); *Schneckloth v Bustamonte*, 412 US 218, 226; 93 S Ct 2041; 36 L Ed 2d 854 (1973); *JDB*, 564 US at 280-281; *Cipriano*, 431 Mich at 334.  This Court's recent decision in *Parks* provides additional context regarding how age may affect the decision-making process of 18-year-olds, and we find it appropriate to consider that context here when determining whether defendant's statements were "freely and voluntarily made."  *Cipriano*, 431 Mich at 334.  Courts in the future should—as we have here—look to the totality of the circumstances of the defendant's interaction with law enforcement to determine whether the characteristics of youth affected the defendant's actions and to what extent.  This will not always result in a finding of involuntariness, just as the consideration of similar factors does not always result in a term-of-years sentence in the context of juvenile sentencing.[6]

---

[6] In support of its argument, the dissent also cites this author's dissenting opinion in *Parks*, which concerned whether the categorical exclusion from mandatory life-without-parole sentences for persons aged 17 and younger should be extended to 18-year-olds.  This author dissented, concluding that both the United States and Michigan Constitutions permit the imposition of mandatory life-without-parole sentences upon 18-year-olds and that this Court should not "strike down a statute because we disagree with the Legislature's policy choice."  *Parks*, 510 Mich at 295 (CLEMENT, J., dissenting).

Regarding the former, this author's statement that 18-year-olds "are sufficiently neurologically developed to make major decisions about their lives" was a recognition that 18 is the general age at which society considers a person to be an adult.  *Id*. at 283-284.  This statement was made in the context of the constitutional proportionality analysis, which requires courts to measure the severity of the punishment against the gravity of the crime committed.  In other words, the fact that society generally allows 18-year-olds to make major decisions about their lives weighed in favor of a finding that the severity of the punishment fit the gravity of the offense for that class of defendants.  But this conclusion is not inherently incompatible with the premise that 18-year-olds are still developing neurologically.  (In fact, as this author stated explicitly in *Parks*, "I do not argue with the science the majority discusses."  *Id*. at 282.)  The *Cipriano* factors involve no bright-line

Returning to the *Cipriano* factors, the length of the interrogation, at approximately three hours, was not excessively long. Compare with *id*. at 336-337 (agreeing with the defendant's concession that his statements were voluntary despite the fact that his interrogation lasted nearly 26 hours).[7] However, relatedly, the interrogation occurred during early morning hours, from approximately 3:36 a.m. until 6:41 a.m. There is no indication that defendant slept or had the opportunity to sleep between his arrival at the hospital with White the evening prior, his arrest later that evening, and the beginning of the interrogation. At minimum, defendant was awake and subject to interrogation from 3:36 a.m. to 6:41 a.m., and one can reasonably infer that the deprivation of sleep during those early morning hours affected defendant's decision-making abilities.[8] Like the

rule like the one at issue in *Parks*, nor do they require a constitutional proportionality analysis; instead, they simply mandate that the courts take age into account when assessing voluntariness. Considering the common-sense principle that very young adults are more susceptible and impressionable is a simple application of the *Cipriano* factors, just as it would be if this Court were assessing an elderly defendant suffering from mental vulnerabilities due to age.

Regarding the latter, this Court's present opinion does not interfere with the policy-making function of the Legislature as this author charged the majority opinion in *Parks* with doing. This Court's present opinion does not strike down an existing statute or otherwise interfere with the Legislature's existing expression of policy. Finally, to whatever extent this author's dissenting opinion in *Parks* does conflict with today's holding, it is the majority decision in *Parks* that is binding law.

[7] We do not mean to suggest that police questioning that lasts less than 26 hours can never be considered excessively long for purposes of determining whether a defendant's constitutional rights were violated. The duration of an interrogation must be viewed along a spectrum, and three hours of questioning, while lengthy, does not fall on the excessive end of that spectrum.

[8] We do not suggest, as the dissent wonders, that law enforcement must always avoid nighttime interrogations. The objective circumstances here indicate some level of sleep deprivation, and this weighs toward, but is not dispositive of, involuntariness. The dissent

17

deprivation of other basic necessities such as food and water, sleep deprivation has been long considered a factor weighing against the voluntariness of a statement. See *Ashcraft v Tennessee*, 322 US 143, 150 n 6; 64 S Ct 921; 88 L Ed 1192 (1944).

Regarding defendant's health, although the details are sparse in the record, there is an indication that defendant had recently received a cancer diagnosis, had undergone treatment, and was suffering ill effects, including weight loss and inhibited movement, that may have affected his ability to endure interrogation.

Other *Cipriano* factors, however, weigh in favor of voluntariness or are largely neutral. The officers advised defendant of his constitutional rights at the start of the interrogation, and defendant both read and signed the advice-of-rights form. Defendant does not allege that he was injured, intoxicated, or drugged when he was interrogated. Defendant also denies that he was physically abused. Further, although defendant reported that he had missed a grade and was enrolled as a senior in an alternative school, the record is silent as to whether these circumstances were due to academic or behavioral struggles. And finally, defendant's previous juvenile adjudication meant that he had some limited previous experience with law enforcement, albeit in a different context.

Outside of the factors specifically identified in *Cipriano*, this Court must also address any other factual circumstances, psychological effects, and coercive tactics employed by the officers that may have contributed to an overbearing of the defendant's

---

challenges the lack of record support for sleep deprivation, but the record establishes the timing of the early-hours interrogation, and there is no record support in opposition to the common-sense conclusion that an interrogation from 3:36 a.m. until 6:41 a.m. results in some level of sleep deprivation that is likely to have harmful effects.

free will.  See *Cipriano*, 431 Mich at 334, and *Schneckloth v Bustamonte*, 412 US 218, 226; 93 S Ct 2041; 36 L Ed 2d 854 (1973).  While many interrogation strategies do not *necessarily* render a confession involuntary, these tactics tend to undermine a defendant's free will and so must be considered in the voluntariness analysis.[9]  Here, one such tactic employed by law enforcement was the officers' repeated and specific references to leniency.  While the officers did not make explicit promises of leniency, they heavily implied that defendant would receive a sentence of 20 years to life if he did not cooperate but that he could receive a sentence as low as two years if he did.  Specifically, while

---

[9] Defendant and amici, citing extensive research regarding the interplay between coercive interrogation tactics and false confessions, urge this Court to hold that statements given during interrogations in which certain coercive tactics were used are per se inadmissible. Research illustrating a strong correlation between the use of false evidence and an interrogee providing a false confession is particularly concerning.  See Kassin, *Duped: Why Innocent People Confess—and Why We Believe Their Confessions* (Lanham: Prometheus Books, 2022); Snook et al, *Urgent Issues and Prospects in Reforming Interrogation Practices in the United States and Canada*, 26 Legal & Criminological Psychol 1 (2021); Appleby, Hasel, & Kassin, *Police-Induced Confessions: An Empirical Analysis of Their Content and Impact*, 19 Psychol, Crime & L 111 (2013); Kassin et al, *Police-Induced Confessions: Risk Factors & Recommendations*, 34 Law & Hum Behav 3 (2010); Perillo & Kassin, *Inside Interrogation: The Lie, The Bluff, and False Confessions*, 35 Law & Hum Behav 327 (2011); Horselenberg, Merckelbach, & Josephs, *Individual Differences and False Confessions: A Conceptual Replication of Kassin and Kiechel (1996)*, 9 Psychol, Crime & L 1 (2003).

However, we decline defendant's and amici's invitations to adopt a per se rule at this time.  "The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this" that involve "fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused," *Haynes v Washington*, 373 US 503, 515; 83 S Ct 1336; 10 L Ed 2d 513 (1963).  While our understanding of interrogation tactics and their effects on free will have evolved since *Haynes* and will continue to do so, at present, the totality-of-the-circumstances analysis employed by this Court in *Cipriano* is sufficient to account for the effect of these tactics on a defendant's free will.

19

coaxing defendant to "[j]ust tell us what happened," Detective Lucie told defendant that if he did not, White would turn on defendant and blame defendant, and as a result, "you going to do 20 to life." When Officer MacDonald later stated that he "didn't say you was going to do 20 years," he explained that "[y]ou control that . . . you control your own destiny." This clarification emphasized that it was defendant's cooperation that determined whether defendant would receive a 20-to-life sentence or a lesser sentence. Officer MacDonald also offered an analogy of a similarly situated defendant who "took her own fate in her own hands" and cooperated with law enforcement when faced with murder charges and instead of being "gone forever," she "got two years."

The transcript reflects that defendant took these statements as an assurance of a lesser sentence if he cooperated. He repeatedly referred to his potential punishments as set forth by the officers, including his statements that "[y]a'll talking about two, three years" and "[y]a'll talking about 20 or 2. Who wouldn't take 2?"[10] Although Detective Lucie later clarified that the officers "don't hand down sentencing," she nonetheless emphasized that "someone does the right thing they come out winning" and affirmed defendant when he said, "So I should come out a winner." Officer MacDonald also shortly thereafter elaborated, "if you truthful all the way through this yeah it's gonna turn out good for you."

---

[10] The dissent disregards these specific statements because they were made after defendant made his first inculpatory statement. We do not agree that the timing of these statements renders them irrelevant. Further, to the extent that one may argue that the comments—because of their timing—constitute an attempt by defendant to remedy the giving of the inculpatory statement, defendant made other statements before admitting to "[d]riving there" that reflect the same understanding of the officers' references to punishment. For example, defendant asked, "Why I'm going to do 20 to life?" and stated, "Dude, 20 years though—" long before he made his first inculpatory statement.

20

Given that the officers continued to make these implications of leniency, their limited qualifying language was not sufficient to undo the implications' coercive effect. See *Conte*, 421 Mich at 740 (opinion by WILLIAMS, C.J.) (stating that "subtle intimations [of leniency] can convey as much as express statements" and that "admonitions to tell the truth, coupled with other factors which could lead the defendant to believe that it is in his best interest to cooperate may amount to a promise of leniency").[11] Such promises or inducements can render a confession involuntary, *id*. at 730, as they may "excite hopes . . . that [the defendant may] be materially benefitted by making disclosures [and] can undermine a defendant's ability to make an autonomous decision to confess," *Commonwealth v Baye*, 462 Mass 246, 257-258; 967 NE2d 1120 (2012) (quotation marks and citation omitted).

Further, during the interrogation, the officers also lied to defendant about the extent of the existing evidence against him. The officers, while asserting that they had not lied to defendant all evening, told defendant that they had an eyewitness who confidently placed defendant at the scene of one of the robberies and home video surveillance that did the same. Neither claim was true. This exaggeration of the strength of the case against

---

[11] The dissent criticizes our citation of then Chief Justice WILLIAMS's opinion in *Conte*, correctly noting that the majority in *Conte* rejected that opinion's proposal for a per se rule of exclusion applicable to statements induced by promises of leniency. But while the *Conte* majority rejected the per se rule, it acknowledged and did not dispute the coercive effect of promises of leniency discussed by then Chief Justice WILLIAMS and concluded that courts should consider such promises within the totality-of-the-circumstances inquiry to determine whether the inducements overcame the interviewee's free will. See, e.g., *Conte*, 421 Mich at 753-754 (opinion by BOYLE, J.); *id*. at 761 (opinion by BRICKLEY, J., concurring in part with BOYLE, J.); *id*. at 761-762 (opinion by CAVANAGH, J., concurring in part with BOYLE, J.).

defendant and the conviction of the officers' belief in defendant's guilt weighs against a finding that defendant's inculpatory statements were made of a free and voluntary mind. See *State v Baker*, 147 Hawai'i 413, 431-432; 465 P3d 860 (2020) (finding that "misrepresentations about the existence of incontrovertible physical evidence that directly implicates the accused is an exceptionally coercive investigation tactic" because it may cause innocent persons to perceive that conviction and punishment are inevitable and therefore falsely confess to ameliorate their current conditions).

Finally, the overall tone of the interrogation was combative. The officers repeatedly told defendant to "man up," chided defendant for "trying to get smart with [them]," and told defendant, "you don't want to battle [with me]." They also persistently used racial slurs and cursed often.[12] The officers' choice of language and tone throughout the interrogation isolated and belittled defendant and likely rendered him more susceptible to the other coercive tactics that were employed. See *Haley v Ohio*, 332 US 596, 600-601; 68 S Ct 302; 92 L Ed 224 (1948) (relying on the defendant's young age, "the hours when

---

[12] Our dissenting colleague notes that one of the officers in the interrogation was also a Black male, like defendant, but that does not preclude the use of racial overtones against defendant in a harmful or coercive manner. Although Justice VIVIANO speculates that, at times, Officer MacDonald may have been trying to bridge a connection to defendant through their shared background, it is hard to imagine how the sustained use of the n-word throughout the interrogation was meant to accomplish this. Moreover, the officers expressed doubts that "n***** . . . in fucking Detroit"—terms they also used to describe defendant—would ever act altruistically when allegedly coming upon an injured person in a bullet-ridden vehicle on a public street. Whatever the officers' intent, the dehumanizing and coercive nature of racial slurs is heightened when used by a public official—even more so when directed toward a member of the public, regardless of whether the official and the person share a racial or ethnic connection.

he was grilled, [and] the duration of his quizzing," among other factors, to find that the defendant's statements were involuntarily made).

While any one of the circumstances discussed above might not be sufficient to render defendant's statements involuntary, we must consider the circumstances collectively and their cumulative effect on defendant's free will.[13] And when considered collectively, we find that the overall effect of the circumstances at hand—defendant's age, the timing of the interrogation, the implications of leniency, the use of false evidence, and the language and tone employed by the officers—was such that defendant's statements were not "freely and voluntarily made." See *Cipriano*, 431 Mich at 334. See also *Baker*,

---

[13] The dissent argues, in part, that we have reached this conclusion without giving due deference to the trial court's factual findings. We note that our analyses of some attendant circumstances of defendant's statements are consistent with the trial court's factual findings. For example, the trial court found that law enforcement made misrepresentations to defendant regarding the criminal investigation. That we determined that these misrepresentations (along with other circumstances) overcame defendant's free will, and the trial court did not, represent different conclusions of law, not divergent factual findings—and this Court is not required to give the same deference to a trial court's conclusions of law as to its factual findings. See *Elliott*, 494 Mich at 300-301. But the dissent is correct that some of our factual findings are not present in the trial court record, specifically that the language used by law enforcement was combative, that defendant was sleep-deprived, and that defendant may have been affected by previous cancer treatments. Although the trial court did not make these factual findings, neither did it make factual findings to the contrary. The trial court addressed only the advisement of rights, the length of the interrogation, and law enforcement's misrepresentations to defendant. However, even assuming that a court's lack of factual findings is subject to the same deference as its affirmative factual findings, this Court's analysis of the entire record (including the videorecording of defendant's interrogation) has left it with a firm and definite conviction that the trial court made a mistake by failing to make findings in keeping with those made by this Court. See *Givans*, 277 Mich App at 119. Notably, the Court of Appeals' decision in *People v Kavanaugh*, 320 Mich App 293, 298; 907 NW2d 845 (2017), provides that a reviewing court need not rely on the trial court's factual findings regarding videorecording evidence contained in the record, and the parties in this case have not asked this Court to revisit that holding.

23

147 Hawai'i at 433 ("An interrogator's use of multiple coercive interrogation tactics in conjunction can exacerbate the coercive effect of the individual tactics.").

Because the use of these involuntary statements at trial violated defendant's constitutional right to due process, see *Cipriano*, 431 Mich at 331, defendant's conviction may only stand if the prosecutor can prove that the error was harmless beyond a reasonable doubt, *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999). Here, the prosecutor cannot do so. Although defendant arrived at the hospital in the vehicle used in the robberies, the only additional evidence that tied him to the robberies was defendant's own incriminating, involuntary statements. Although Claxton's brother identified defendant as the driver of the shooters' vehicle on direct examination at trial, on cross-examination, he admitted that he had not actually seen defendant driving the vehicle. Instead, he remembered that the driver had been wearing a white T-shirt, and he assumed that defendant was the driver when he observed defendant at the hospital wearing a white T-shirt and sitting on the hood of the Intrepid.[14] Defendant's association with the shooters' vehicle at the hospital may be probative of guilt, but it is not evidence sufficient for us to conclude *beyond a reasonable doubt* that a rational jury would have found defendant guilty absent the error in admitting his involuntary statement. See *People v Shepherd*, 472 Mich 343, 347; 697 NW2d 144 (2005) ("A constitutional error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.") (quotation marks, citations, and brackets omitted); *People v Sammons*, 505 Mich

---

[14] It bears noting that a white T-shirt is a particularly common item of clothing, especially among young men, such that its utility as a measure of identification is minimal, at best.

24

31, 56; 949 NW2d 36 (2020) ("When evaluating whether erroneously admitted evidence was harmless beyond a reasonable doubt, we must determine the probable effect of that testimony on the minds of an average jury. Reversal is required if the average jury would have found the prosecution's case significantly less persuasive without the erroneously admitted testimony.") (quotation marks and citations omitted). Accordingly, defendant is entitled to relief.

## III. CONCLUSION

The totality of the circumstances of defendant's interrogation—including his age, the timing of the interrogation, the officers' references to leniency, the officers' use of falsehoods, and the officers' overall tone and use of language—created an environment in which defendant's free will was overborne and the statements he gave were involuntary. Further, the use of these statements at trial violated defendant's constitutional rights, and the prosecution has not proved that their admission at trial was harmless beyond a reasonable doubt. We, accordingly, reverse the judgment of the Court of Appeals. Defendant is therefore entitled to a new trial, and we remand for proceedings consistent with that determination.

We do not retain jurisdiction.

Elizabeth T. Clement
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

25

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v                                      No. 162497

JOSHUA LAMAR-JAMES STEWART,

      Defendant-Appellant.

_____

VIVIANO, J. (*dissenting*).

To find that a suspect gave an involuntary confession, a court must examine the totality of the circumstances, including various factors such as the suspect's age, education, and health, along with the length of questioning and any physical abuse or threats. *People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988). Here, the majority examines the factors and correctly finds that individually, they do not offer much support for the conclusion that defendant's confession was involuntary. Yet, as if by magic, these factors, insufficient on their own, somehow combine to render the confession involuntary. In reaching that conclusion, the majority overrides the decision of the experienced lower court judges who thoroughly and correctly assessed the record and determined the confession was voluntary. I cannot agree with the majority's ultimate conclusion, even if I agree with many of the majority's separate analyses of the factors that seem to find each one inadequate to make the confession involuntary. Because there were no threats, promises of leniency, or physical abuse in this case, and none of the more subjective factors supports a finding of involuntariness, I would hold that the confession was voluntary.

## I. BACKGROUND LAW

The Supreme Court has explained that the rule against involuntary confessions prohibits coercion, i.e., the suspect's will to resist cannot be overborne by law enforcement officials such that the confession is not "freely self-determined." *Rogers v Richmond*, 365 US 534, 544; 81 S Ct 735; 5 L Ed 2d 760 (1961). With regard to the test used to assess coercion, we have stated that "[t]he ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Cipriano*, 431 Mich at 334.

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id*.]

This list includes psychological factors, and it is true that "coercion can be mental as well as physical . . . ." *Miranda v Arizona*, 384 US 436, 448; 86 S Ct 1602; 16 L Ed 2d 694 (1966).[1] Yet the Supreme Court has explained that "voluntariness . . . has always depended on the absence of police overreaching, not on 'free choice' in any broader sense

---

[1] Both this Court and the United States Supreme Court have noted that the same standard applies in the present context (i.e., the voluntariness of confessions) as in determining whether a waiver of *Miranda* rights was voluntary. See *People v Cheatham*, 453 Mich 1, 17; 551 NW2d 355 (1996), discussing *Colorado v Connelly*, 479 US 157, 169-170; 107 S Ct 515; 93 L Ed 2d 473 (1986).

of the word." *Colorado v Connelly*, 479 US 157, 170; 107 S Ct 515; 93 L Ed 2d 473 (1986); see also *United States v Rutledge*, 900 F2d 1127, 1129 (CA 7, 1990) (reading *Connelly* to provide that a confession is voluntary as long as it is not police conduct that destroys the defendant's power of free choice). In light of this guidance, courts have questioned "just what relevance the characteristics and status of the person who gave the confession have in determining whether the requisite element of 'police overreaching' is present." 2 LaFave, Criminal Procedure (4th ed), § 6.2(c), p 687. And as the Seventh Circuit recently observed, "[t]he Supreme Court has not found that police tactics not involving physical or mental exhaustion taken alone were sufficient to show involuntariness." *Dassey v Dittman*, 877 F3d 297, 304 (CA 7, 2017) (en banc); see also *United States v Roberts*, 975 F3d 709, 718 (CA 8, 2020) ("Absent improper threats, use of physical force, or intimidation tactics, psychological pressure almost never renders a confession involuntary."). In fact, courts have repeatedly recognized that, in attempting to elicit evidence from otherwise unwilling individuals while investigating serious or violent criminal activity, police may "play on a suspect's ignorance, fears and anxieties" so long as they do not render "a rational decision . . . impossible." *United States v Sablotny*, 21 F3d 747, 752 (CA 7, 1994); see, e.g., *United States v LeBrun*, 363 F3d 715, 724 (CA 8, 2004) (explaining that police questioning that subjected "a suspect to psychological pressure, making false promises, playing on a suspect's emotions, and using his family against him did not render a confession involuntary"), citing *United States v Astello*, 241 F3d 965, 967-968 (CA 8, 2001).

In other words, even if the defendant's characteristics can be considered, the focus of the analysis should be upon police conduct and whether any threats, intimidation, or

3

physical force were employed. It is therefore jarring that the thrust of the majority's analysis in the present case is on the psychological and subjective factors relating to defendant's characteristics rather than on any police misconduct.

## II. ANALYSIS

## A. *MIRANDA* WARNING

The majority acknowledges, in passing, the officers' administration of *Miranda* warnings as supporting a finding of voluntariness.[2] But the majority does not address the matter at any length or note the significance of this factor. Indeed, the majority does not cite *Miranda v Arizona* anywhere in its opinion.

This is a major omission that undermines the conclusion of the majority. It has often been assumed that giving the *Miranda* warnings will generally render any subsequent confession voluntary. See Primus, *The Future of Confession Law: Toward Rules for the Voluntariness Test*, 114 Mich L Rev 1, 13 (2015) ("To be sure, *Miranda* . . . did not obviate the requirement that a confession be voluntary. But, when the police read a suspect his rights and obtained a valid waiver of those rights, the courts almost always found the resulting confession voluntary."); Marcus, *It's Not Just About* Miranda*: Determining the Voluntariness of Confessions in Criminal Prosecutions*, 40 Val U L Rev 601, 603 (2006) ("The common assumption is often made that, however debatable *Miranda* may be, it has had a definitive impact and has essentially eliminated the need to consider the messy and

---

[2] Under *Miranda*, "an individual must be 'clearly informed,' prior to custodial questioning, that he has, among other rights, 'the right to consult with a lawyer and to have the lawyer with him during interrogation.' " *Florida v Powell*, 559 US 50, 53; 130 S Ct 1195; 175 L Ed 2d 1009 (2010), quoting *Miranda*, 384 US at 471.

4

ineffective rules regarding voluntariness in the interrogation process that were in play before 1966."); 22 Am Jur 2d, Proof of Facts, § 1, p 546 ("It was thought by many that the *Miranda* decision . . . would render the issue of voluntariness of a confession unimportant.").

While this assumption may not always prove true, it is generally a safe one. The United States Supreme Court has recognized that *Miranda* warnings do not "dispense with the voluntariness inquiry" for confessions or statements made after the warnings are given. *Dickerson v United States*, 530 US 428, 444; 120 S Ct 2326; 147 L Ed 2d 405 (2000); see also Nissman & Hagen, Law of Confessions (2d ed, June 2022 update), § 2:1 ("A confession can still be attacked on voluntariness grounds even if police give complete *Miranda* warnings and obtain proper waivers."). But the Court observed that " 'cases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are *rare*.' " *Dickerson*, 530 US at 444, quoting *Berkemer v McCarty*, 468 US 420, 433 n 20; 104 S Ct 3138; 82 L Ed 2d 317 (1984) (emphasis added; brackets omitted); see also *Missouri v Seibert*, 542 US 600, 608-609; 124 S Ct 2601; 159 L Ed 2d 643 (2004) ("[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver."). This makes sense, as the *Miranda* requirement displays a "palpable hostility toward the act of confession *per se*, rather than toward what the Constitution abhors, *compelled* confession." *Dickerson*, 530 US at 450

5

(Scalia, J., dissenting). The only "conceivable basis" for *Miranda* is to "[p]revent[] foolish (rather than compelled) confessions . . . ." *Id*. at 449.

In the present case, defendant was provided *Miranda* warnings, although he quibbles with their administration. Although declining to provide any substantial analysis on the topic, the majority does not appear to dispute that defendant's *Miranda* warnings were properly administered. Defendant first objects that the officers unduly minimized the importance of the warnings by taking only five minutes to go through them and characterizing them as "paperwork." As an initial matter, as the Court of Appeals noted, defendant has not provided any legal support for the proposition that characterizing the warnings as "paperwork" (or the like) blunts their effectiveness or is somehow problematic. Nor has he offered anything suggesting that the rendition of the warnings must take a certain amount of time or come in a certain form. "*Miranda* was not intended, and has not been interpreted, as establishing a precise incantation that must be given prior to a custodial interrogation." *People v Mathews*, 505 Mich 1114, 1116 (2020) (VIVIANO, J., dissenting). The key is that the " 'essential information must be conveyed.' " *Id*. at 1117 (citation omitted). The warnings themselves are not long and can easily be conveyed in five minutes. And the prefatory remark about "paperwork" here did not deny or conflict with the information being conveyed. Indeed, it is hard to see how calling the warnings "paperwork" somehow undercuts the warnings. In a very real sense, the warnings were "paperwork": defendant was given a paper sheet from which he was asked to read the warnings aloud.[3]

---

[3] It is not even apparent that the officers referred to the warnings as "paperwork." Officer MacDonald started off the interview respectfully, asking defendant, "You want me [to] call

Defendant cannot identify any flaws with the information being conveyed by the warnings, which defendant read aloud. Instead, he notes simply that he mispronounced the word "present" when he read the following line: "I have the right to have an attorney, lawyer present during the time I answer my questions or make any statements." He pronounced it as a verb, with the emphasis on the second syllable, in the sense that the attorney could make a presentation. But properly read as a noun and pronounced with the emphasis on the first syllable, it means that the lawyer can be physically with the defendant during the questioning. See *Miranda*, 384 US at 470. This does not suggest, however, that defendant misunderstood the nature of the right. The entire line clearly indicates that whatever the lawyer would do on his behalf, it would be done while defendant was being interrogated. Even with the mispronunciation, defendant clearly repeated that the lawyer could represent him during questioning.

Defendant also observes that at the end of his recitation of the warnings, he asked whether to put his initials in the spot marked for the police officer's name. But anyone who has completed a form knows that the spots for initials and signatures can sometimes

you Mr. Stewart or call you Josh?" Defendant responded, "Call me Josh." After that, Officer MacDonald made the remark about paperwork: "All right. Let's go through some paperwork real quick, Man. There's going to be a couple questions about what happened— about what happened tonight." He then asked defendant about the name of his friend, how to spell defendant's last name, when defendant was born, and what grade in school defendant had completed. At that point, he gave defendant "a certificate of your constitutional rights," asking defendant to "read one through five and then next to each one you's [sic] going to put your initials. And all your initials indicates means [sic] you understand what you're reading and then if you have any questions you just ask me." Thus, it is not clear that the officer intended to link his stray comment about "paperwork" to the *Miranda* warnings or that defendant (or any reasonable person in defendant's position) would have believed there was such a link. And even so, the officer expressly told defendant to ask him any questions he might have.

be confusing. His apparent confusion about how to fill out the form does not suggest that he did not understand the content of the rights listed therein.[4]

Consequently, because the *Miranda* warnings were properly given, it would be a "rare" case in which the subsequent confession could be deemed involuntary. And as noted above, it would be rarer still—indeed, beyond the scope of Supreme Court precedent—to find that the confession was involuntary based solely on psychological coercion stemming from defendant's subjective characteristics.

## B. DEFENDANT'S CHARACTERISTICS

### 1. AGE

The majority's analysis begins by examining defendant's age. The majority notes that although defendant was 18 years old and "an adult under the law, we have elsewhere recognized that 18-year-olds are still undergoing physiological and neurological maturation, meaning that their decision-making abilities are not fully developed." Citing *People v Parks*, 510 Mich 225; 987 NW2d 161 (2022). According to the majority, 18-year-olds are still developing and susceptible to outside pressures.

---

[4] Even to the extent that defendant's question could signal some substantive confusion, it is well below the level of confusion necessary to render a confession invalid. For example, in one recent federal circuit case, the suspect had limited intellectual ability, he appeared to have misunderstood the officers' promises, and "[a]t times it appeared as though [he] simply did not grasp the gravity of his confession—after confessing to rape and murder, he asked the officers if he would be back at school that afternoon in time to turn in a project." *Dassey*, 877 F3d at 312. Yet the court upheld a state court's application of the Supreme Court precedent finding that, under a totality test, the confession was voluntary. *Id*. at 313. If the suspect there, who did not understand the nature of the interview or his admissions, could voluntarily confess, then the fact that defendant here was uncertain where to initial the form hardly suggests that the confession was involuntary.

In response, I can do no better than to offer the words of the author of the present majority opinion, who dissented from these precise sentiments in *Parks* just last term:

> We are not the first court to consider that young adults are still developing neurologically and still have some juvenile traits. The United States Supreme Court recognized young adults' ongoing neurological development in 2005 in *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005), in which it found that the execution of juvenile offenders was unconstitutional. Tellingly, the Court commented:
>
>> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. [*Id*. at 574.]
>
> I find that reasoning persuasive. A line must be drawn, and that line will always lead to some arbitrary results, as there will be no appreciable difference between a person one day before his 18th birthday versus on his 18th birthday—or now, under the majority's holding, one day before his 19th birthday versus on his 19th birthday. Though the age at which society considers a person an adult has changed and is not consistent across every activity, it is still true that 18 is the general age at which society considers someone an adult. *Roper*, 543 US at 574 ("The age of 18 is the point where society draws the line for many purposes between childhood and adulthood."). Even if 18-year-olds are not so well-developed neurologically as 27-year-olds, *they are sufficiently neurologically developed to make major decisions about their lives*. [*Parks*, 510 Mich at 283-284 (CLEMENT, J., dissenting) (emphasis added).]

The *Parks* dissent further expressed hesitance about accepting the scientific claims made by the majority, noting that those claims involved a policy determination that should be left to the legislative branch, which is "better able to consider scientific evidence and weigh competing interests. Unlike the Legislature, the judiciary resolves disputes between parties. That function does not easily translate to evaluating the strength of scientific

9

claims.  Despite the decades of legal experience the justices on this Court have, I do not believe we are well-suited for this foray into neuroscience."  *Id*. at 296-297 (citations omitted).

There have been trenchant criticisms of the use of the studies that the majority here ultimately relies on, via *Parks*.[5]  Moreover, there are significant equality and autonomy

---

[5] Maroney, *The False Promise of Adolescent Brain Science in Juvenile Justice*, 85 Notre Dame L Rev 89, 161-163 (2009) ("In support of this narrative advocates, experts, and commentators most frequently cite to a small number of functional-imaging studies that show teens to display more amygdala, and less frontal-lobe, activation than adults when engaged in an emotion-recognition task.  These studies provide little support for the assertion.  In a typical study, subjects' brains are scanned while they view photographs of unfamiliar persons displaying stylized 'fearful' facial expressions; they then are asked to identify the emotion being displayed.  This task bears little relation to juvenile offending.  The only reported behavioral outcome is teens' higher rate of misidentification of the emotion, and that differential may be erased by using color photographs and including images of people the teens know.  It is tempting to conclude (as at least one researcher has) that a teenager, if confronted with a person displaying a fearful expression, is likely to misinterpret that expression and harm the person out of a misguided instinct toward self-defense.  That conclusion may be true, but it cannot be reached on the basis of the studies.  Indeed, other studies show that when presented with different tasks teenagers tend to display *greater* frontal-lobe activity than adults.  This does not suggest that they are somehow more 'rational,' but instead may indicate that processes that have by adulthood become automatic require more effortful thought for adolescents.  Some studies indicate that aggression and violence sometimes correlate with *low* levels of amygdala activation; yet others suggest that teens have great variation in amygdala response.") (citations omitted); *Roper*, 543 US at 618 (Scalia, J., dissenting) ("At most, these studies conclude that, *on average*, or *in most cases*, persons under 18 are unable to take moral responsibility for their actions.  Not one of the cited studies opines that all individuals under 18 are unable to appreciate the nature of their crimes."); *Commonwealth v DiGiambattista*, 442 Mass 423, 459; 813 NE2d 516 (2004) (Spina, J., dissenting) (noting that these experiments have been "dubbed 'not yet ready for "prime time" ' research"), quoting Agar, *The Admissibility of False Confession Expert Testimony*, 8 Army Lawyer 26, 42 (1999); see also *DiGiambattista*, 442 Mass at 458-459 (Spina, J., dissenting) (" 'Currently, the empirical base that supports the [false confession] theory has too many unanswered questions, no known error rate, and just one laboratory experiment to back it up.  This foundation cannot support reliable conclusions just yet.' ") (second alteration omitted), quoting *The Admissibility*, 8 Army Lawyer at 42.

concerns with the majority's conclusion that 18-year-olds are too immature to resist pressures to confess or make other significant life decisions. If this is true, then is an 18-year-old, for example, able to decide whether to have an abortion? *Roper*, 543 US at 617-618 (Scalia, J., dissenting) (criticizing the American Psychological Association for taking the position that "persons under 18 lack the ability to take moral responsibility for their decisions," when the Association had previously argued that "juveniles are mature enough to decide whether to obtain an abortion without parental involvement"). Are other groups, such as the elderly, who experience cognitive changes, unable to make significant life decisions? See *Sablotny*, 21 F3d at 751-752. What about athletes and other individuals who have experienced multiple concussions or people who have experienced brain injuries?

I fear that the majority, by relying on questionable scientific studies to suggest that an adult is too young to make significant life decisions, is opening the door to making age irrelevant to the test. As the *Parks* dissent concluded, a line must be drawn somewhere, and certainly 18 years represents an age of sufficient maturity. This reflects the common view of courts across the country, which have not afforded special treatment in this context to 18-year-olds or other groups of adults on the basis of age.[6]

---

[6] See, e.g., *Oregon v Elstad*, 470 US 298; 105 S Ct 1285; 84 L Ed 2d 222 (1985) (holding that a confession by an 18-year-old was admissible, despite the police failing to initially provide *Miranda* warnings, and without any indication that the defendant's age was a relevant consideration); *Astello*, 241 F3d at 967-968 (concluding that a confession was voluntary when an 18-year-old discussed his wish to see his mother, police implied potential benefits upon confession, police referred and appealed to the individual's family honor, and the individual had been previously arrested, and emphasizing the difference between the individual and "juvenile[s]"); *Sablotny*, 21 F3d at 751-752 (declining to apply a "special standard" to an individual on the basis of being elderly); cf. *JDB v North*

11

## 2. EDUCATIONAL BACKGROUND AND HEALTH

Although defendant contends that his educational background supports a finding that the confession was involuntary, the majority lists this factor as either neutral or supporting voluntariness. The majority's rationale is that "although defendant reported that he had missed a grade and was enrolled as a senior in an alternative school, the record is silent as to whether these circumstances were due to academic or behavioral struggles." I agree with this but would add that, according to defendant's brief, the alternative school he attended was for students "who cannot learn effectively in a traditional school environment . . . due to learning disabilities, *certain medical conditions*, psychological and behavioral issues, or advanced skills." (Emphasis added.) Defendant did have cancer, which was in remission, and it is entirely possible that he attended the school for this reason, which would not relate to any cognitive challenges or behavioral issues.

I disagree with the majority's reliance on defendant's cancer treatment as a meaningful factor in determining that the confession was involuntary. Certainly, such treatment can be difficult and draining. But defendant indicated that he was in remission and has provided no direct evidence of the effect of the types of treatments he had undergone on his decision-making. The majority asserts that defendant's "weight loss and inhibited movement . . . may have affected his ability to endure interrogation." But again, there is no evidence to support this speculation and it does not appear that defendant ever requested a break from the interview. The trial court, not this Court, is the finder of fact,

---

*Carolina*, 564 US 261, 277; 131 S Ct 2394; 180 L Ed 2d 310 (2011) (suggesting that even teenagers close to the age of 18 might react during interrogations as would a typical 18-year-old and that, consequently, age in those cases would not be a significant factor in determining whether the individual is in custody for purposes of *Miranda*).

and the trial court's decision is devoid of any conclusion that defendant was affected by cancer treatments. The standard of review applicable to the trial court's factual determinations is clear error, and this standard does not permit us to credit a new construction of the facts or review the facts de novo. *Anderson v City of Bessemer City*, 470 US 564, 573; 105 S Ct 1504; 84 L Ed 2d 518 (1985) (" 'In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo.' ") (citation omitted); 5 Am Jur 2d, Appellate Review, § 591, p 423 (explaining that on clear-error review it is inappropriate for appellate courts to "give the facts another construction" or "resolve ambiguities differently" than the trier of fact).[7] Thus, while this factor might lend some support to defendant's argument, it does not add much, given the sparse record.

---

[7] In response to this charge, the majority admits that much of its analysis is based on its own factual findings and not on its agreement (or disagreement) with the facts found by the trial court. However, our role as an appellate court is limited to reexamining the trial court's factual findings and the legal conclusions it made by applying the law to those facts. If the majority deems it necessary to address other facts, it should remand to the trial court for it to make factual findings on the points the majority believes it missed the first time around. As the United States Supreme Court has explained, "[f]actfinding is the basic responsibility of district courts, rather than appellate courts," and appellate courts "should not . . . in the first instance" resolve a factual dispute." See *Pullman-Standard v Swint*, 456 US 273, 291-292; 102 S Ct 1781; 72 L Ed 2d 66 (1982) (quotation marks and citation omitted). Our Court of Appeals has also adhered to this basic principle of appellate review. See *In re Martin*, 200 Mich App 703, 717; 504 NW2d 917 (1993) ("It is not the function of an appellate court to decide disputed questions of fact in the first instance and then choose between affirmance or reversal by testing its factual conclusion against that which the trial court *might* have . . . reached.") (quotation marks and citation omitted). See generally Steinman, *Appellate Courts As First Responders: The Constitutionality and Propriety of Appellate Courts' Resolving Issues in the First Instance*, 87 Notre Dame L Rev 1521, 1521-1522 (2012) ("Legal professionals, litigants, and the people of this country . . . view it to be the role of trial judges and juries, administrative agencies, and arbitrators—not appellate courts—to make the initial findings of fact, reach the initial

## C. OTHER FACTORS

### 1. DURATION AND TIMING OF THE INTERVIEW

The majority admits that the timing of the interview—roughly three hours—"was not excessively long." However, the majority believes it is significant that the interview occurred in the early morning and that "[t]here is no indication that defendant slept or had the opportunity to sleep" between being detained by the police and being questioned. I agree with the majority that the length of the interview does not support a finding of involuntariness. Defendant has not provided any authority for the suggestion that a three-hour interrogation is so lengthy as to be coercive. Professor Eve Primus has noted that "[m]ost scholars who have looked at this problem [i.e., the optimal length of time for a police interrogation] have suggested that continuous questioning be limited to between four and six hours." *The Future of Confession Law*, 114 Mich L Rev at 37. And, as the majority here acknowledges, this Court has upheld an interrogation that intermittently occurred over the course of 26 hours. *Cipriano*, 431 Mich at 336-337. The interrogation here was well below these levels.

As for the timing of the interview, I disagree with the majority. The Court of Appeals noted that "[a]lthough the officers interrogated [defendant] in the middle of the night, there is no evidence that he was deprived of sleep, food, or drink." *People v Stewart*,

---

conclusions of law, apply the law to the facts in the first instance, and exercise discretion as to issues, raised in the foundational proceeding, whose resolution is not dictated by rules of law. We then see it as the function of courts of appeals acting as such to re-examine fact-findings, conclusions of law, applications of law to fact, and exercises of discretion under appropriate standards of review. We generally expect courts of appeals . . . not to act as a court of first instance in finding facts, stating the law, or exercising other judicial functions.").

unpublished per curiam opinion of the Court of Appeals, issued November 24, 2020 (Docket No. 343755), p 4. Notably, the trial court, as the finder of fact, reviewed the available record and made no finding that defendant was sleep deprived. See *Anderson*, 470 US at 573. The majority seems to infer that defendant was sleep deprived, but other than the hour of the interview there is no record evidence to support this inference. And even to the extent he might have been tired, that was not a result of the police conduct— the alleged crimes being investigated had occurred the night before, and the police had just apprehended him. There is no contention that the police somehow dragged out proceedings, let alone that they did so to deprive defendant of sleep or weaken his resolve. It is not clear what the majority would expect police officers to do in these circumstances, when a criminal investigation leads to a detention late at night or early in the morning. Must the police offer suspects a comfortable bed (or jail cell) to rest in before questioning them, even if (as here) the suspects never indicate they are tired? The majority cites nothing to support such a proposition. And " '[a] statement is not involuntary simply because a defendant was tired or under the influence of drugs; the condition must have rendered the defendant confused, unable to understand, unable to remember what had occurred, or otherwise unable to knowingly and voluntarily waive the right to remain silent.' " *State v Spencer*, ___ Kan ___, ___; 527 P3d 921, 926 (2023) (citation omitted). The majority points to nothing suggesting that any supposed fatigue on defendant's part led to his confusion or inability to understand what was transpiring.

15

## 2. PROMISES OF LENIENCY

The majority finds that the officers implied defendant would receive leniency in exchange for a confession and that such implications were coercive. This Court has rejected a per se rule that would find as coercive promises of leniency that led to a confession. *People v Conte*, 421 Mich 704; 365 NW2d 648 (1984). And "the Supreme Court has not treated general assurances of leniency in exchange for cooperation or confession as coercive. . . . [S]uch general assurances are not legally relevant facts for determining whether a suspect's will was overborne and a confession was involuntary." *Dassey*, 877 F3d at 316 (collecting sources); *United States v Jacques*, 744 F3d 804, 809-810 (CA 1, 2014) (stating that it is "well settled" that "suggesting . . . cooperation may lead to more favorable treatment" does not coerce a defendant to confess); *LeBrun*, 363 F3d at 724-725 (explaining that an express promise of leniency for the defendant, coupled with disclaimers that the police do not control the outcome of criminal proceedings, did not support a finding of coercion); see also 2 LaFave, Criminal Procedure (4th ed), § 6.2(c), pp 699-700 (noting that general assurances are not coercive). Moreover, courts have held that officers can recite potential sentences the suspect might receive. See *United States v Bautista-Avila*, 6 F3d 1360, 1364-1365 (CA 9, 1993) (collecting sources); *United States v Montgomery*, 555 F3d 623, 630 (CA 7, 2009) (noting that an officer's provision of inaccurate information on a potential sentence was not coercive when the statement was not tied to a deal or obligation to cooperate); *Astello*, 241 F3d at 966-968 (holding that the officers' assertion that a life sentence was a possible punishment and their implication that the defendant could potentially receive a reduced sentence if he confessed did not render the confession coercive). This is true even when the suspect is a minor. See *Simmons v*

16

*Bowersox*, 235 F3d 1124, 1133 (CA 8, 2001) ("Furthermore, '[a] truthful and noncoercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will,' even when the accused is a minor."), quoting *United States v Ballard*, 586 F2d 1060, 1063 (CA 5, 1978) (alteration in *Simmons*).

Nothing in the present case amounts to an impermissible promise of leniency. Indeed, the alleged promises here could not reasonably be interpreted as promises at all. At one point, roughly halfway into the interrogation, the officers were encouraging defendant to tell the truth. They asked him whether his phone records would put him at the locations of the crimes. He said "no." Officer MacDonald then said, "I'm doing the search warrant on your phone. . . . I ain't bluffed you all day. . . . So, you want to sit here and put your fate in what you think mother f****** can't prove? You going to lose." Defendant responded, "Dude, 20 years though," apparently referring to an anticipated prison sentence. Officer MacDonald replied: "Man, I didn't say you was going to do 20 years. I didn't say he [i.e., the other defendant] was going to do 20 years. You control that. You control—listen, Man—at the end of the day, Bro, you control your own—you control your own destiny." This statement implied that defendant himself has some control over the outcome in this case, but the officer expressly denied stating any number of years for the sentence. Furthermore, given that defendant potentially faced charges of first-degree felony murder, armed robbery, and assault with intent to commit murder, it was abundantly reasonable and accurate to believe that defendant could receive a sentence of 20 years' imprisonment. See, e.g., MCL 750.316(1) (stating that first-degree murder is punishable "by imprisonment for life without eligibility for parole"); MCL 750.83 ("Assault with intent to commit murder—Any person who shall assault another with intent

17

to commit the crime of murder, shall be guilty of a felony, punishable by imprisonment in the state prison for life or any number of years."). In fact, the officers' reference to a possible 20-year sentence could be viewed as an understatement, given that defendant was acquitted of multiple charges but was still sentenced to a minimum of 25 years' imprisonment.

The other examples of "promises" during defendant's interrogation are all of the same sort. Indeed, Officer MacDonald unambiguously explained to defendant that the cops did not have power over sentencing:

> I'm not trying to send kids to prison. I'm trying to find out the truth of what happened. That's my job. Is to find out what happened. What led up to it and what happened afterwards. What's the evidence. That's all I'm here. I don't send anybody to prison . . . . I'm not the f****** judge. I'm not the f****** jury. I'm the guy that's supposed to find out what happened. And that's it. That's my job. And once I find out what happened I'm done. My job is over. I give it to somebody else.

Shortly after this, he told defendant that "[y]ou facing the judicial system," and then he related the example of the female suspect who got two years:

> I just got done doing a homicide trial, Man? This mother f***** shot two people with his sister in the car. With his sister in the car he killed two people. With his sister in the car. And she was scared to leave. You know what this mother f***** did? Point the gun at her and told her drive the f*** off because he didn't give a f*** about her. And when she got locked up I talked to her. She did the same s*** you did. 'Man, I don't got nothing to say. I'm protect my brother.' Two weeks later you know what she did? 'Hey, MacDonald, Man, I want to talk to you.' F*** that. I ain't let this mother f***** decide my fate. This mother f***** got found guilty of murder. You know what she got, Bro? Mother f****** two years. Because she decided her own mother f****** fate. If she'd went into that courtroom with the same attitude you got you know what happen to·her? She get found guilty of murder. And then she'd been gone forever. But instead she took her own fate in her own hands and she got two years. But she wasn't no

letting no [sic] brother f****** intimidate her and f****** go to prison for life.

There is no indication that this story was false, nor is there any indication that it was wrong to imply that cooperation with the police could redound to the benefit of defendant or others like him. See, e.g., *Dassey*, 877 F3d at 316 (holding that "general assurances of leniency in exchange for cooperation or confession" are "not legally relevant facts for determining whether a suspect's will was overborne and a confession was involuntary"); *Simmons*, 235 F3d at 1133 ("The statement to an accused that telling the truth 'would be better for him' does not constitute an implied or express promise of leniency for the purpose of rendering his confession involuntary.") (citation omitted); *LeBrun*, 363 F3d at 725 (promises of leniency did not render a confession coerced because the police disclaimed any certainty as to whether the defendant would be prosecuted and a "mistaken belief" by a defendant "does not render a confession involuntary") (emphasis omitted).

Defendant was clearly affected by this, as he repeatedly responded, "Oh, god." He then said he did not take a vehicle or shoot anyone or have a gun. Next, he expressed despair over his situation:

> *Detective Lucie*:·So, what did you do?
>
> *Officer MacDonald*: Josh, was you in the car when they was—when they was on Savage?
>
> *Mr. Stewart*: I don't even want to be living no more, Man.
>
> *Officer MacDonald*: Hey, Bro, Come on.
>
> *Mr. Stewart*: I'm serious, Man.
>
> *Officer MacDonald*: Listen—Listen—Bro, don't even—don't even—don't even

19

> *Mr. Stewart*: I just f\*\*\*\*\* my life up.  Might just Dog.  I just f\*\*\*\*\* my s\*\*\*.

But after this exchange, they started talking about the events at issue.  Defendant asserted he was just in there for a stolen car.  The police disabused him of this belief:

> *Detective Lucie*: You think that?
>
> *Mr. Stewart*: I'm here for murder?  That's what I'm in here for?
>
> *Detective Lucie*: I'm a police officer that works for the homicide—homicide section.  Yes.  Exactly what I do.
>
> *Officer MacDonald*: Well that's the game of murder, Man.

After this, defendant referred again to a two-year sentence, but Officer MacDonald made it clear that he was not promising that:

> *Mr. Stewart*: Ya'll talking bout two, three years.
>
> *Officer MacDonald*: You want two years or—I mean—*I'm not saying you getting two years*.  I just gave you an example of what happened.
>
> *Detective Lucie*: That's the business.
>
> *Officer MacDonald*: I gave an example of what somebody did by taking their own path.  By taking their own life in their own hands and that was her outcome.
>
> *Mr. Stewart*: Right.  Right.
>
> *Officer MacDonald*: A'ight?  I'm trying to give you an example of what somebody—what happened when somebody took their own life in their own—and put it in their hands.  [Emphasis added.]

Shortly after this, defendant began giving his statement of his involvement in the crimes.

The officers made clear that there was no promise being offered and that they had no power to make such a promise.  They repeatedly advised defendant that the example they had related earlier of the female suspect was just that, an example.  Even under a strict

rule where promises of leniency are per se coercive, it is hard to see any such promise here. And even assuming there was such a promise, it was hedged with so many qualifications that it cannot be given great weight under the totality-of-the-circumstances test.

In coming to the opposite conclusion, the majority relies heavily on its interpretation of defendant's statements as reflecting his belief that he would obtain a lesser sentence if he confessed. But, as noted, implications of potential leniency and mistaken beliefs as to a reduced sentence are simply insufficient to render a confession coerced. See, e.g., *Dassey*, 877 F3d at 316; *LeBrun*, 363 F3d at 724-725; *Simmons*, 235 F3d at 1133. Defendant nowhere stated that he understood the officers to be making any promises. He simply stated, "[y]a'll [sic] talking about two, three years" and "[y]a'll talking about 20 or 2. Who wouldn't take 2?" But defendant made these statements after providing his confession. And even so, the officers repeatedly emphasized that they had no power to offer leniency.

In light of these denials, to find an impermissible promise of leniency based solely on defendant's supposed misunderstanding would make meaningless the rule that general assurances of leniency are permissible. Officers could not make any statements concerning leniency lest the suspect feign a misunderstanding of those statements as a promise—a misunderstanding that, according to the majority's logic, the officers could not undo despite express and repeated explanations that no promises were being made. That the majority lacks support for its approach is demonstrated by the fact that it must rely on the opinion for affirmance in *Conte*, which a majority of the Court rejected, promulgating a per se rule against assurances of lenience. See *Conte*, 421 Mich at 740 (opinion by WILLIAMS, C.J.).

21

I therefore would not find that any promises of leniency were made here.

### 3. FALSE EVIDENCE AND THREATS

The majority also concludes that the confession was involuntary because the police in the interview inflated the nature and extent of the evidence against defendant and because "the overall tone of the interrogation was combative." With regard to the inflated evidence, the police here misrepresented the strength of the evidence against defendant, falsely telling him they had video evidence, that they had witnesses from the incidents, and that another defendant would testify that he fired the shots.

In general, trickery short of outright fraud (such as false promises of leniency) is permissible—the United States Supreme Court has expressly rejected a per se ban on such tactics. See *Frazier v Cupp*, 394 US 731; 89 S Ct 1420; 22 L Ed 2d 684 (1969).[8] And, in particular, these sorts of false allegations, concerning the defendant's connections to the crime and the evidence thereof, are considered the least coercive form of trickery. See *Holland v McGinnis*, 963 F2d 1044, 1051 (CA 7, 1992) ("Of the numerous varieties of police trickery, . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary."). This is because "[i]nflating evidence of [a suspect's]

---

[8] See *Rutledge*, 900 F2d at 1131 ("Far from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead—all up to limits not exceeded here."); *Hadley v Williams*, 368 F3d 747, 749 (CA 7, 2004) (explaining that the law "draws the line at outright fraud, as where police extract a confession in exchange for a false promise to set the defendant free"); see also *United States v Villalpando*, 588 F3d 1124, 1128 (CA 7, 2009) ("In these cases, we made clear that while a false promise of leniency may render a statement involuntary, police tactics short of the false promise are usually permissible. 'Trickery, deceit, even impersonation do not render a confession inadmissible . . . .' ") (citation omitted); *Ledbetter v Edwards*, 35 F3d 1062, 1069 (CA 6, 1994) (" 'Neither "mere emotionalism and confusion," nor mere "trickery," will alone necessarily invalidate a confession.' ") (citations omitted).

guilt interfere[s] little, if at all, with his 'free and deliberate choice' of whether to confess . . . ." *Id*. Such misrepresentations do not interfere with a suspect's rational decision-making, as they do not lead him to considerations "beyond his own beliefs regarding his actual guilt or innocence, his moral sense of right and wrong, and his judgment regarding the likelihood that the police had garnered enough valid evidence linking him to the crime." *Id*. Another reason why intrinsic evidence is less coercive is that the suspect is more likely to have firsthand knowledge about it. See generally 2 LaFave, Criminal Procedure (4th ed), § 6.2(c), pp 708-709 ("Moreover, a distinction must be made between the kind of trickery discussed earlier, involving facts of which a defendant has firsthand knowledge, and trickery by 'a lie unrelated to the government's evidence of his guilt, that had consequences to others,' as the latter instance is more likely to induce an innocent person to give a confession.").[9]

Consequently, the use of the false evidence here is not indicative of coercion. Moreover, the false evidence here was not extensive. Regarding the supposed video evidence, the cops did not dwell on it or say that defendant appeared in the video. As for the witnesses, the police barely referred to them except to say that they existed. Furthermore, there was eyewitness and other circumstantial evidence that defendant was the driver in this case. With regard to the assertion that a codefendant would testify against

---

[9] By contrast with these so-called intrinsic considerations, courts have found that extrinsic considerations—those not related to a defendant's connection with the crime—are more coercive. *Holland*, 963 F2d at 1051-1052. Those extrinsic considerations involve threats and promises, such as that a defendant's children will be removed or his or her welfare benefits cut off. *Id*. Such concerns impair free choice and the reliability of the confession. *Id*. at 1052. A false promise distorts the suspect's view of the alternatives among which he or she is being asked to choose. *Villalpando*, 588 F3d at 1128.

23

defendant, it is not clear that the police were suggesting that the codefendant had actually made this assertion or that they had evidence to this effect. Rather, they were predicting what the codefendant would do: "You're not saying what happened," they told defendant. The codefendant is "smart enough to put you as the shooter. He knows how to lie better than you do. He will testify in the court, in a room full of people, in front of a judge that you the one killed dude. . . . He's going to put the one that killed somebody in your hand. So he can take the plea deal and be out and be able to make babies and s*** before he get old." Indeed, shortly after this, the cops told defendant that they already knew he was not the shooter and that they were not trying to get defendant to admit to things he did not do. In context, then, this was not a definite and false statement about the evidence the cops had assembled against defendant. And, in any event, it is not coercive to encourage even juvenile suspects to tell the truth by indicating that their co-participants will provide evidence against them. *United States v Ballard*, 586 F2d 1060, 1063 (CA 5, 1978) ("Encouraging a suspect to tell the truth and suggesting that his cohorts might leave him 'holding the bag' does not, as a matter of law, overcome a confessor's will, even though he or she may be sixteen years of age.").

As for the "combative" tone of the interrogation, the majority does not suggest that any threats were made against defendant or his family. At best, the majority accuses the officers of using intemperate language.[10] But the majority offers no persuasive support

---

[10] This includes Officer MacDonald's use of the n-word. But defendant and his supporting amici have not cited any caselaw indicating that the use of this word renders a confession involuntary. It is also worth noting that Officer MacDonald, who is black (like defendant), attempted to use race to foster a connection with defendant: "But you sit here—you thinking these mother f****** trying to send me to prison forever. They don't understand.

that such a tactic is coercive.[11]  And it would take a willful distortion of the evidence to suggest that the "combative tone" involved impermissible threats.  One statement that could be perceived as threatening when taken out of context was Officer MacDonald's remark that he was going to have to "battle this b**** out."  But this came toward the end of the interrogation, and he was not threatening defendant at all, let alone with a physical altercation.  In fact, his reference to "battle" was not even about his conversation with defendant—it was about the officer's future conversation with the codefendant.  He was telling defendant that they had witnesses as well as direct physical evidence of what happened, specifically, codefendant's gunshot wound, so he would not need to rely on what the other participants told him.  "So, I don't need you," he told defendant.  "I don't need to go back and say bro this is what [defendant] told me.  I don't need to say this."  He continued:

> *Officer MacDonald*: . . . So I don't need to—I don't need to play you.  That's not—I don't need to—that's not my game.  I come straight at a mother f***** one-on-one.  No sidebar.  I don't bring in mother f****** off the sideline. . . .   I come at your a** straight up man to man and we have this

Mother f*****, we black.  I ain't white.  I ain't grow up with a mother f****** silver spoon in my mother f****** mouth.  I had hustle. . . .  So, I ain't trying to sit here and act like I don't know what the f*** [is] going on."

[11] The majority cites only a pre-*Miranda* case for support, *Haley v Ohio*, 332 US 596; 68 S Ct 302; 92 L Ed 224 (1948).  The facts there were a far cry from those in the present case.  Most significantly, the suspect in *Haley* was 15 years old and was never offered or given counsel. *Id*. at 599-600.  The Court also found it significant that after the confession, the suspect "was kept incommunicado for over three days during which the lawyer retained to represent him twice tried to see him and twice was refused admission" and that the suspect's mother "was not allowed to see him for over five days after his arrest." *Id*. at 600.  Further, the questioning took five hours. *Id*. at 598.  This hardly suggests that a combative tone is coercive as to an 18-year-old who was given *Miranda* warnings and questioned for a shorter period of time.

talk. And I smell b******* I let you know it's b*******. Did I not do that today? Did I go and say Josh you pulled a s*** dude[?]

> *Mr. Stewart*: Right.

> *Officer MacDonald*: That s*** like that don't happen in the D. Cause I know. So, I ain't have to come at you with no side s***. When I go to this [n-word] I don't gotta go sideways. I'm coming his a** head on. My gloves on, his gloves on and we gone sit there and we gone battle this b**** out. And I'm going to tell him straight up. You got holes in you. You got evidence in your body. I don't need nothing else. So, you can sit here and you can do whatever you want to do and then we gone go back and forth. So, your name won't come up. That's not me. I don't do that. I ain't do that with you. I ain't gone do it with him. I don't do it with nobody else I talk to. I'm 100. I head on.

The officer was not suggesting a battle with defendant, and the battle he was talking about was clearly not going to be physical—he referred to it as sitting and talking. Moreover, it seems apparent that the officer was trying to assure defendant that his name would not be used in the interrogation with the codefendant. This can hardly be considered a threat.

The other officer also referred to "battle" during the interrogation. Defendant was saying that he went to get a smoke at some point. The officer asked, "With who?" Defendant responded, "What you mean with who? Myself. I'm smoke by myself." The officer then asked:

> *Detective Lucie*: You trying to get smart with me?

> *Mr. Stewart*: No.

> *Detective Lucie*: Cause you don't want to battle.

> *Mr. Stewart*: No. There ain't no battle or none of that.

> *Detective Lucie*: This is your life.

> *Mr. Stewart*: Right.

*Detective Lucie*: If I ask you who the f*** you was smoking with you tell me.

*Mr. Stewart*: And I'm saying myself. I said I was going to smoke by myself.

Clearly, the officer was not talking about some physical confrontation. And defendant did not misunderstand the meaning. The officer verbally confronted defendant after defendant shifted his story repeatedly and claimed he had simply come upon his codefendant in a car riddled with bullet holes, which the officers believed to be false. He said there was "no battle" occurring, by which he meant that there was no present battle— he would have no need to assure the officer that there was no *physical* battle going on, because the officer would be well aware of that. By assuring the officer that there was no battle happening, he meant that he was not trying to be argumentative or rude. Notably, the trial court reviewing this record made no finding that the officer's language was coercive or violent.

Consequently, I cannot agree that there were any threats. And any combative tone is legally irrelevant without more.

### 4. ADDITIONAL FACTORS AND TOTALITY ANALYSIS

The majority correctly recognizes that some of the most critical factors favor a finding of voluntariness. Defendant was not physically abused or threatened. He was not "injured, intoxicated, or drugged" when interviewed. *Cipriano*, 431 Mich at 334. Further, he had prior experience with law enforcement. The majority never explains why these key factors are overcome by the more subjective and psychological factors that no court has ever found sufficient, on their own, to make a confession involuntary. Indeed, as noted, the majority admits that many of these factors are insufficient to find coercion. The

27

majority is forced to soft-pedal even those factors that it claims support today's holding. For example, it acknowledges that no express promises were made to defendant and that the officers repeatedly attempted to dispel any misunderstanding on that point.

We are thus left with a balance of generally insufficient factors that, at very best, offer tepid support for the majority's conclusion, against more important factors that weigh heavily against it. In these circumstances, it is impossible to discern a principled and generally applicable rationale for the result reached today.

### III. CONCLUSION

In light of the above analysis, I believe defendant's confession was voluntary; the analysis of the trial court and the unanimous panel of the Court of Appeals was correct; and the jury's convictions of robbery, assault, theft, and illegal firearm possession should stand. Significantly, defendant was given *Miranda* warnings, he was not physically abused, he was not threatened, and there were no promises of leniency. Under the caselaw discussed above, these are the most important factors to consider. Indeed, as mentioned, the United States Supreme Court has never found psychological coercion alone to be sufficient to render a confession involuntary. Yet that is essentially what the majority decides today. It relies on dubious research from *Parks* to conclude that some adults are too young to be treated as adults, suggests that the police must offer suspects a respite before late-night or early-morning questioning, and emphasizes that the officers' rudeness is coercive. In so doing, the majority substitutes its views on best practices for police interrogations for what the Constitution demands. I fear that standard police interview techniques—ones that have been used for decades to solve some of the most heinous

28

crimes—will be imperiled by today's decision. Under the majority's rationale, it appears that police interrogation of an adult suspect involved in a violent crime will need to be conducted as though it were a social conversation among friends rather than an effort to protect the community and bring the guilty to justice. I therefore dissent.[12]

David F. Viviano
Brian K. Zahra

---

[12] Defendant also raised a challenge to his sentencing, specifically that MCL 769.34(10) is unconstitutional because it requires an appellate court to affirm within-guidelines sentences such as defendant's here. For the reasons given in Part II of Chief Justice CLEMENT's partial dissent in *People v Posey*, ___ Mich ___; ___ NW2d ___ (2023) (Docket No. 162373), I would reject defendant's argument.